IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KELLY HOPKINS, et al.              :        CIVIL ACTION
                                   :
              Plaintiffs,          :        NO. 07-3679
                                   :
      v.                           :
                                   :
NEW DAY FINANCIAL, et al.          :
                                   :
              Defendants.          :


## Opinion and Order

**Slomsky, J.**                                            **August 14, 2009**

Before the Court is Defendants' Motion to Dismiss and Compel Arbitration of claims

instituted by nine former employees (collectively referred to as "Plaintiffs") of Defendant New

Day Financial, LLC ("New Day") (Docket No. 63).[1]  Plaintiffs instituted this suit against

Defendant New Day and two of its executives, Paul Alger and Robert Posner (collectively

referred to as "Defendants"), alleging violations of the Federal Fair Labor Standards Act, 29

U.S.C. § 201 *et seq.* ("FLSA").  In their Motion, Defendants seek to have Plaintiffs' claims

arbitrated rather than decided by a jury.  For the reasons noted below, the Court will deny the

Motion to Dismiss and Compel Arbitration and order a jury trial on the enforceability of

arbitration agreements signed by Plaintiffs as a condition of their employment with Defendant

New Day (the "Arbitration Agreements").

---

[1] Defendants also filed a Motion to Dismiss the Individual Defendants.  The
determination of the Motion to Compel Arbitration will dictate whether this Court oversees the
resolution of the merits of this case.  Accordingly, the Motion to Dismiss the Individual
Defendants is stayed pending the outcome of the trial on the issue of the enforceability of the
Arbitration Agreements.

I.     **BACKGROUND**

    A.     **Arbitration Agreement Provisions**

Plaintiffs were employed as Account Executives for Defendant New Day Financial, LLC ("New Day").  Defendant New Day is a mortgage company which specializes in lending money for the purchase or refinance of residential real estate above the market value of the property itself.  In their capacity as Account Executives, Plaintiffs performed inside sales jobs.  Plaintiffs allege that they were required to work six days a week and a minimum of 63 hours per week.  Plaintiffs further allege that they were not afforded a lunch break and were required to work most holidays.  Plaintiffs claim that they were not paid for overtime and their salaries–ranging between $25,000 and $30,000 per year–provided inadequate compensation for the hours worked.

Plaintiffs were required as a condition of employment at New Day to complete certain paperwork and sign various agreements.  Included in these papers was an Arbitration Agreement which Defendant New Day required its Account Executives to sign.  The pertinent part of the Arbitration Agreement is capitalized in the original and provides:

> BY SIGNING BELOW, THE PARTIES ACKNOWLEDGE THAT THEY HAD A RIGHT TO LITIGATE CERTAIN CLAIMS THROUGH A COURT BEFORE A JUDGE OR JURY; AND THAT THEY WILL NOT HAVE THAT RIGHT IF EITHER PARTY ELECTS ARBITRATION PURSUANT TO THIS AGREEMENT, EXCEPT AS PROVIDED HEREIN. THE PARTIES HEREBY KNOWINGLY AND VOLUNTARILY WAIVE THEIR RIGHTS TO LITIGATE SUCH CLAIMS UPON ELECTION OF ARBITRATION BY EITHER PARTY. THE PARTIES FURTHER ACKNOWLEDGE THAT THEY HAVE THIS ENTIRE ARBITRATION AGREEMENT , AND THAT THEY ARE ENTERING INTO THIS ARBITRATION AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS ARBITRATION

AGREEMENT. THIS ARBITRATION AGREEMENT
PROVIDES ONLY A SUBSTITUTION OF FORUMS, AND
INVOLVES NO SURRENDER, BY EITHER PARTY, OF ANY
SUBSTANTIVE STATUTORY OR COMMON LAW
BENEFIT, PROTECTION, OR DEFENSE.

The Arbitration Agreement does not prevent either "party's use of bankruptcy, replevin, judicial foreclosure, injunction, or any other pre-judgment or provisional remedy relating to or to protect any collateral, trade secrets, contract rights, unfair competition, or security or property interests, now or hereafter owed by either party to the other."

The Arbitration Agreement does place additional restrictions on class actions and joinder providing:

Neither the employer nor New Day shall, without written consent
of the other party, have the right to: (1) participate in a class
action in court or in arbitration, either as a class representative or
a class member including claims arising under the Federal Fair
Labor Standards Act, 29 U.S.C. § 201 et seq.; or (2) join or
consolidate claims with any other claims asserted by any other
person.

Defendant New Day also agreed to advance fees associated with filing and arbitrating any claims subject to the Arbitration Agreement. However, if New Day prevailed in the arbitration, then the employee had to reimburse Defendant New Day for fees it advanced as well as any other fees Defendant New Day was entitled to under law. Nevertheless, if the employee can demonstrate to the "satisfaction of the arbitrator that the employee is of limited financial capacity, then New Day shall pay all fees associated with arbitrating the claim."

## B.   Circumstances Surrounding the Signing of the Arbitration Agreements

On September 4, 2007, Plaintiff Kelly Hopkins and six other former employees filed a collective action pursuant to the FLSA against Defendants New Day, Posner and Alger alleging

3

unfair labor practices, as noted above.  Subsequently, two additional former Account Executives, Kristopher Spevak and Andrew Cox, exercised their right under the FLSA to join in the action. Defendants have moved to dismiss the action and compel arbitration or, in the alternative, to stay the action pending resolution of the arbitration.  In opposing the Motion, Plaintiffs challenge the validity of the Arbitration Agreements arguing that they signed them under duress and the Agreements are unconscionable.  In this regard, the Court makes the following findings as they pertain to each Plaintiff's signing of the Arbitration Agreement.

1.    <u>Kristofer Spevak</u>

Plaintiff Kristofer Spevak ("Spevak") signed the Arbitration Agreement after he began his employment at New Day.[2]   Thirty-one year old Spevak does not have a college degree and previously worked for a Lehigh Valley newspaper.

Defendant Alger had a meeting with Spevak and approximately five other Account Executives in New Day's Conshohocken office on June 22, 2005, six months after Spevak joined Defendant New Day.  (Spevak Dep. 55:12-56:15.)  At the meeting, the Account Executives were presented with a new compensation plan which changed commissions from a fee-based system to a tier-based system.  (Spevak Dep. 56:21-57:11.)  In addition to discussing the new compensation plan, Defendant Alger also provided Spevak with a copy of the Arbitration Agreement. Defendant Alger informed the Account Executives that they had only five minutes to sign the Agreement and that no copies could leave the room.  (Spevak Dep. 66:1-12.)  At no time did anyone from Defendant New Day explain the terms of the Arbitration Agreement and Spevak

---

[2]The precise circumstances surrounding the signing of the arbitration agreement are contested by the parties.  The Court's findings incorporate the version of facts presented by the parties.

testified that he did not understand its meaning.  (Spevak Dep. 94:17-24; 77:19-78:2.)  Defendant

Alger simply noted that signing the Arbitration Agreement "was a requirement to stay employed

with New Day and receive a paycheck."  (Spevak Dep. 95:4-8.)   Spevak signed the Arbitration

Agreement without counsel, without asking any questions and without receiving a copy.  (Spevak

Dep. 74:23-76:24.)

        2.    <u>Gary Colby</u>

Plaintiff Gary Colby became an employee of New Day in late March, 2005.  He had a

Bachelors of Science Degree in mechanical engineering.  (Colby Dep. 25:10-19.)  Colby alleges

that he signed the Arbitration Agreement about six months after he began working for Defendant

New Day.  (Colby Dep. 53:19-25; 60:18-21.)   Colby had already left his prior job for New Day.

(Colby Dep. 47:14-15.)  Defendant Alger and Meg Garrett, a human resources representative,

presented the Agreement to Colby in the Conshohocken office.  (Colby Dep. 61:4-6.)  Alger gave

Colby forty-five minutes to sign a stack of documents before leaving the room.  (Colby Dep.

48:16-18.)

Colby claims he had just enough time to sign everything, but not enough time to read

before signing.  (Colby Dep. 46:6-16.)  He did not ask for more time because, as he testified, "it

was sign or leave."  (Colby Dep. 47:13-14.)  Garrett and Defendant Alger did not offer to answer

any questions and no one asked questions.  (Colby Dep. 48:19-23.)  Colby admitted that he had

no questions at the time the documents were presented.  He testified that the legal jargon

confused him.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 18.)  Colby claims that Alger would have

looked down on anyone who asked for a copy of the Agreement.  (Colby Dep. 61:15-22.)  Colby

interpreted Defendants Posner's and Alger's frequent statement that "if you are with us, then

you're with us, and if you're not, you're not," to really mean that "you should do what

management says or management will fire you."  (Pls.' Resp. to Defs.' Mot. to Dismiss at 18.)

3.     Brian J. Smith, Jr.

Plaintiff Brian J. Smith, Jr. earned a bachelor's degree from Neumann College and sold

insurance for Northwestern Mutual before quitting to work at New Day.  (Smith Dep. 9:14;

10:14, 19; 25:20-21.)  Smith worked for New Day for approximately fifteen to sixteen months.

(Smith Dep. 24:1.)

Smith trained in Maryland during his first six to seven weeks before starting his

employment in Pennsylvania.  (Smith Dep. 26:10; 28:14-15.)  Defendant Alger and Christina

Akbari ("Akbari"), an employee in Defendant New Day's human resources department,

presented the Arbitration Agreement to Smith and five or six other account executives in a

conference room in the Pennsylvania office.  (Smith Dep. 26:7-9.)  Defendant Alger allegedly

instructed the group to either sign the Arbitration Agreement or quit.  (Smith Dep. 38:16-19.)

Defendant Alger and Akbari allowed the group one-half hour to read and sign the Agreement.

(Smith Dep. 39:6.)  Smith claims that Defendant Alger described the Arbitration Agreement as

favorable to the employees because they could settle any dispute with New Day without paying

for an attorney.  (Smith Dep. 41:15-17, 19-22.)[3]

---

[3]Smith testified that he did not sign the Arbitration Agreement on June 22, 2005, the date written on the Arbitration Agreement.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 15.)  Smith testified that he was still training in Maryland on June 22, 2005.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 16.)  He signed the Agreement after he was a veteran on the sales floor, which requires at least three months of sales experience.  Since Smith began in sales in July 2005, he could not have signed the Agreement on June 22, 2005.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 16.)

4.    Matt A. Aden

On Plaintiff Matt Aden's first day of employment, he was placed in a room in Defendant

New Day's Maryland office with other new employees.  Akbari and Jaron Glenn, another New

Day human resources employee, handed the group a stack of paperwork, including the

Arbitration Agreement.  (Aden Dep. 68:6.)  Akbari  told the group that their first paycheck

"would be held up" if they did not sign.  (Aden Dep. 48:5-11.)  She allowed the group one hour

to read and sign the documents.  (Aden Dep. 68:6.)

Aden believed one hour was insufficient to review the documents, but he never informed

the company that he needed additional time.  (Aden Dep. 69:21-23; 89:6-9.)  Aden feared that he

would be terminated if he either asked questions or did not sign the documents in the time

allotted.  (Aden Dep. 75:11.)   Moreover, Akbari left the room after instructing the group.

Therefore, Aden did not have the opportunity to ask her questions within the time allotted.

(Aden Dep. 73:19-22.)

Aden had never seen an Arbitration Agreement before.  He recalls reading the Arbitration

Agreement but not understanding what rights he gave up by agreeing to arbitration and what

process or results might ensue.  (Aden Dep. 77:12-13; 82:7-11.)  Aden received copies of the

documents a few days after signing them.

5.    Jonathan Park Heumann

Plaintiff Jonathan Park Heumann is a graduate of Radford University.  The recruiters who

steered him to Defendant New Day did not discuss employment contracts or Arbitration

Agreements with him before he began his employment.  (Heumann Dep. 40:11-12.)  On

Heumann's first day of employment in the Maryland office, he was in a room with five to ten

new recruits.  Akbari handed each new employee a large stack of documents which included the

Arbitration Agreement.  (Heumann Dep. 40:6.)  She allotted the group an hour to sign the

documents, saying it was "mandatory [to] sign these documents if we [the group] wanted to work

for New Day Financial, she said we wouldn't get paid unless we signed . . . ." (Heumann Dep.

40:22-25; 41:1-3.)

     Heumann had heard the word arbitration used only in the baseball context.  (Heumann

Dep. 39:10-23.)  Heumann told Akbari that he did not know what the Arbitration Agreement

meant.  Akbari then told Heumann to "[j]ust sign it and we'll get back to it later this afternoon."

(Heumann Dep. 43:3-4.)  Everyone in the conference room heard this remark.  (Heumann Dep.

43:8-9.)  Akbari never returned later that afternoon to explain the Agreement.  (Heumann Dep.

46:4.)  Another new employee in the group also told Akbari that he did not know what the

Arbitration Agreement meant.  (Heumann Dep. 41:5-19; 42:1; 66:12-13.)  Heumann claims

Akbari responded "you have to sign it if you want to work for New Day . . . ."  (Heumann Dep.

41:22-25; 42:1.)

        6.   <u>Byron Gorcey</u>

     Plaintiff Byron Gorcey graduated from Temple University and worked as a landscaper

when New Day recruiters contacted him.  There was no mention of the Arbitration Agreement

during recruitment.

     During Gorcey's first day on July 17, 2006, Taki Yoshioka, a human resources

representative, handed him an inch thick packet of documents to sign.  The two were alone in the

room.  (Gorcey Dep. 79:5-7.)  Yoshioka asked Gorcey whether he had any questions and told

8

him that Defendant New Day would not pay him if he did not sign the Agreement.  (Gorcey Dep. 80:11-12; 79:5-7.)  Gorcey testified that he did not understand what the terms "arbitration" or "binding arbitration" meant when he signed the Arbitration Agreement.  (Gorcey Dep. 60:10-13; 84:10-13.)  He did not understand the first paragraph of the Agreement.  (Gorcey Dep. 62:13-22.)  He still does not understand the Agreement now.  (Gorcey Dep. 64:23-24.)  Nevertheless, Gorcey did not ask about the Agreement because he thought he had to sign it or he would not be offered employment by New Day.  (Gorcey Dep. 81:14-18.)   He was never informed that he could have a copy of the Agreement.  (Gorcey Dep. 38:17-20.)

New Day terminated Gorcey on June 22, 2007.  (Gorcey Dep. 51:20-25.)  Gorcey had quit his landscaping job the day of his final interview with New Day and began working for New Day one week later.  (Gorcey Dep. 39:17-23.)  Gorcey feels he "burn[ed] bridges" by quitting and cannot return to his landscaping job.  (Gorcey Dep. 41:4; 42:17.)

7.    Kelly Hopkins

Plaintiff Kelly Hopkins worked for New Day from June 19, 2006 through February 3, 2007. (Hopkins Dep. 19:11-12.)  Hopkins worked in the auto industry before New Day, but is presently unemployed. (Hopkins Dep. 9:6; 11:2-6; 17:5-6.)

On Hopkins first day, Yosioka afforded him and five to ten new employees only forty-five minutes to sign employment documents, including the Arbitration Agreement.  (Hopkins Dep. 31:10-13.)  Yosioka told the group that they had to fill out the documents and sign every form or they could not begin work.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 22.)  Hopkins reviewed the paperwork as best he could given the time restriction.  (Hopkins Dep. 31:3.)  He testified that he needed more time.  (Hopkins Dep. 31:15-16.)  Hopkins never asked for copies of

the Arbitration Agreement.  He did not think he could obtain copies of the Agreement stating: "I was told I had to have the paperwork signed before 10:00 a.m. . . . because we were going into this other orientation.  So did they flat out refuse, no, but did they give me the option to take it home, I don't think they did that either."  (Hopkins Dep. 47:6-13.)

Hopkins had heard the term arbitration before in relation to lemon laws in the automotive industry.  (Hopkins Dep. 33:13-24.)  He did not understand the difference between arbitration and mediation, nor did he know what an arbitrator was when he signed the Agreement.  (Pls.' Resp. to Defs.' Mot. to Dismiss at 22.)[4]

8.   Kevin Vanic

Plaintiff Kevin Vanic received a bachelor's degree from East Strousburg University. (Vanic Dep. 26:5-7.)  Vanic worked for himself selling life insurance before beginning with New Day in August 2005.  (Vanic Dep. 29:23-25.)

During his three months of training, Vanic met with Alger in the Maryland office.  Alger presented the Arbitration Agreement to him.  (Vanic Dep. 90:14; 92:2.)  Alger did not permit a copy to leave the room.  (Vanic Dep. 90:14.)  Vanic believed that if he did not sign the document, he would lose his job and not get paid.  (Vanic Dep. 95:1-3.)

Vanic does not recall signing the Arbitration Agreement, but admits that the Agreement bears his signature.  (Vanic Dep. 95:1-3.)  Vanic speculated that he probably did not understand the Arbitration Agreement when he originally signed it, and still did not when deposed.  (Pls.'

_____

[4] Hopkins did ask a question, but not about the Arbitration Agreement.  He asked about the noncompete Agreement, and Yoshioka told him that he had to sign it, but not to worry because it has never been enforced.  (Hopkins Dep. 32:24-25.)

Resp. to Defs.' Mot. to Dismiss at 32.)

        9.    <u>Andrew Cox</u>

    New Day employed Plaintiff Andrew Cox from September 2005 to June 2006.  Cox

previously worked as a director for a YMCA.  (Cox Dep. 30:21).  Directors at the YMCA

customarily provide four weeks notice before leaving.  (Cox Dep. 125:3-4.)  New Day required

Cox to start within one week, despite his attempt to negotiate a later start date to comply with

YMCA requirements.  Because Cox left without providing adequate notice, his colleagues at the

YMCA told him he was not welcome to reapply.  (Cox Dep. 31:11-15.)

    On Cox's first day of training in Maryland, Meg Garrett, Human Resource Director for

Defendant New Day, took Cox into a small office, handed him a thick stack of papers and

instructed him to sign them in order to begin work.  (Cox Dep. 79:21-25.)  The packet contained

the Arbitration Agreement.  (Cox Dep. 80:12-13.)  Garrett allotted Cox one hour to review and

sign the papers.  (Cox Dep. 79:25.)

    Cox read the Arbitration Agreement.  (Cox Dep. 81:3-4.)  He had heard the term

arbitration in a sports context and understood it to be "where two parties can't agree on

something they use a third party to . . . decide whose side's right."  (Cox Dep. 81:14-16.)  Cox

did not understand what the Arbitration Agreement meant and asked Garrett when she returned.

(Cox Dep. 81:22-23.)  Cox became a little suspicious when Garrett stated that she did not

understand the Agreement.  (Cox Dep. 82:11:24.)  Garret allegedly told Cox that she "doesn't

know exactly what it means, she just knows that I need to sign it . . . so that I can begin work, get

put on payroll and get paid."  (Cox Dep. 82:6-9.)  He did not ask anyone else about the

Agreement.  (Cox Dep. 83:1-4.)  Cox signed the Arbitration Agreement even though he did not

understand its terms because he had already stopped working at the YMCA and needed to start

receiving a salary.  (Cox Dep. 84:18-23.)  Cox did not ask for a copy of any of these documents.

(Cox Dep. 114:16-18.)

## II.     DISCUSSION

### A.     Standard on Motion to Compel Arbitration

The Federal Arbitration Act establishes a strong federal policy in favor of resolving

disputes through arbitration.  Alexander v. Anthony Int'l L.P., 341 F.3d 256, 265 (3d Cir. 2003).

While there is a presumption in favor of enforcing an arbitration agreement, the Court must

carefully analyze any claim opposing the validity of such agreements.  Par-Knit Mills, Inc. v.

Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 (3d Cir. 1980).  The Court, in considering a

motion to compel arbitration, which is opposed on the ground that no valid agreement to arbitrate

had been entered into by the parties, should view the facts in a light most favorable to the party

opposing arbitration and give them the benefit of all reasonable doubts and inferences.  Id.  This

is the same standard used by the Court in resolving a summary judgment motion.  Id. at 54 n. 9.

Accordingly, the Court may consider all affidavits, exhibits and discovery in the record.  If after

reviewing the record, the Court finds that there is a doubt as to the existence of a valid agreement

to arbitrate, the matter should be submitted to a jury upon a proper demand.  Id.  "An

unequivocal denial that the agreement has been made, accompanied by supporting affidavits . . .

in most cases should be sufficient to require a jury determination on whether there had in fact

been a 'meeting of the minds'."  Id.  Accordingly, the Court must determine whether a factual

dispute exists as to the validity of the Agreement and, if so, allow a jury to decide whether there

was a valid agreement to arbitrate.[5]

### B.    Choice of Law

As a preliminary matter, the Court must determine whether to apply Pennsylvania or Maryland law to this action.  Defendants assert that Maryland law should apply while Plaintiffs argue that Pennsylvania law governs.  In his June 30, 2008 Memorandum Order in this matter (Docket No. 27), Judge Louis Pollack, to whom this case was previously assigned, addressed this issue concluding, "The court looks primarily to the law of Pennsylvania, because it is the forum state and appears to have a strong relationship with the agreements at issue."  The Court is mindful of the law of the case doctrine and agrees with Judge Pollack's conclusion.

In general, a federal court, sitting in a diversity action or with supplemental jurisdiction over a common law claim, must apply the choice of law rules of the forum state.  See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941); Berg Chilling Systems, Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).  Accordingly, the Court will apply Pennsylvania choice of law rules to this dispute.

Under Pennsylvania choice of law rules, the Court must first determine whether a true conflict exists.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007) (noting "the first part of the choice of law inquiry is best understood as determining if there is an actual or real conflict between the potentially applicable laws.").  If there is no true conflict, no further choice

---

[5] Defendants title their Motion as a Motion to Dismiss or in the Alternative to Stay Litigation.  The law in the Third Circuit is that the FAA mandates a district court to stay litigation upon granting a motion to compel arbitration.  Lloyd v. Hovensa, LLC, 369 F.3d 263, 269 (3d Cir. 2004).  The Court is not permitted to dismiss the case.  Id.  Accordingly, the Court will only consider whether it is proper to stay the litigation and compel arbitration.  As noted, however, the Motion to Compel Arbitration is being denied.

of law analysis is necessary and the law of Pennsylvania, as the forum state, would apply.  Id.

Here, as to duress, Defendants admit that "[t]he definition of duress is generally the same in every jurisdiction" and classifies the differences between Maryland and Pennsylvania duress law as merely "minor."  (Defendants' Motion to Compel Arbitration, Docket No. 63).  The Court agrees.  The Court views any slight differences between Maryland and Pennsylvania duress law as immaterial to the outcome here.

Similarly, there is no conflict between Maryland and Pennsylvania law in regard to unconscionability.  Under Pennsylvania law "a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it."  Salley v. Option One Mortgage Corp., 925 A.2d 115, 119 (Pa. 2007).  Likewise, under Maryland law an unconscionable contract is evidenced by "(1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party."  Walther v. Sovereign Bank, 872 A.2d 735, 743 (Md. 2005).  The Court finds that because both states employ almost identical definitions of unconscionability, consisting of both procedural and substantive aspects, there is no conflict between Maryland and Pennsylvania laws in this respect.

Accordingly, because the outcome of this matter would be the same under either Maryland or Pennsylvania law, no true conflict exists and the Court will apply Pennsylvania law to Plaintiffs' claims.  See Hammersmith, 480 F.3d at 230.[6]

---

[6] Although a conflicts analysis is not necessary, the Court nevertheless finds that Pennsylvania law would apply under the state's flexible choice of law analysis in considering the two components: "significant relationship" and "governmental interest."  See Kilmer v. The Connecticut Indemnity Company, 189 F. Supp. 2d 237 (M.D. Pa. 2002).  Here, eight of nine

C.     **Enforceability of the Agreement**

Addressing the merits of Defendants' Motion, Plaintiffs advance several arguments in support of their position that the Arbitration Agreements are unenforceable.  Plaintiffs argue that the Arbitration Agreements (1) were made under duress; (2) are substantively and procedurally unconscionable and (3) are not binding because they were not signed.  While Plaintiffs' first and third arguments are unavailing, the Court finds that Plaintiffs have presented evidence that creates a genuine issue of material fact as to whether the Arbitration Agreements are unconscionable.

1.     <u>Duress</u>

Plaintiffs first argue that the circumstances under which they were presented with the Arbitration Agreements amount to duress, and that the Agreements are unenforceable for this reason.

As previously stated by Judge Pollack in his June 30, 2008 Memorandum Order, under Pennsylvania law, "[d]uress is defined as 'that degree of restraint or danger, either actually inflicted or threatened and impending, which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness.'"  Memorandum Order, June 30, 2008 (Docket No. 27) (<u>quoting</u> <u>Strickland v. Univ. of Scranton</u>, 700 A.2d 979, 986 (Pa. Super. Ct. 1997)).  When the nature of the threat is purely economic, as opposed to physical, the doctrine of economic duress or business compulsion applies.

---

Plaintiffs were domiciled in Pennsylvania when they worked for Defendant New Day.  (Pl. Response to Motion to Compel Arbitration, Ex. 18).  While Defendant New Day was a Maryland corporation, it had an office in Conshohocken, Pennsylvania at which Plaintiffs worked.  Further, the individual Defendants resided in Pennsylvania when Plaintiffs instituted this action.

> Business compulsion is a species of duress, not common law
> duress, but duress clothed in modern dress . . . .  Business
> compulsion is not established merely by proof that consent
> was secured by the pressure of financial circumstances, but a
> threat of serious financial loss may be sufficient to constitute
> duress and to be ground for relief where an ordinary suit at
> law or equity may not be an adequate remedy.

Harsco v. Zlotnickiu, 779 F.2d 906, 911 (3d Cir. 1985) (quoting Litten v. Jonathan Logan, Inc.,

286 A.2d 913, 917-918 (Pa. Super Ct. 1977)).  Moreover, economic duress is present only if the

defendant "brings about the state of financial distress in which plaintiffs find themselves at the

time of signing." Id.

In Harsco, the Third Circuit rejected an employee's argument that he was under economic

duress when ordered to sign an employment contract, two years after he had commenced

employment, even though the employee alleged that he was "humiliated, harassed, cursed at and

threatened by the [employer's] employees to sign the Employment Agreement against his will.

[The employee] was told he would in addition to suffering other harms, be fired if he did not

sign." Id.  Even accepting those facts as true, the Third Circuit held that the employee failed to

establish a defense of economic duress under Pennsylvania law because the "situation that caused

[the employee] to fear the loss of his job– the need to support his wife and child – was of his own

making." The court further reasoned "[The employer] did not manipulate [the employee's]

financial circumstances to render him more susceptible to economic pressure." Id.; see also Reed

v. Smithkline Beckman Corp., 569 F. Supp. 672 (E.D. Pa. 1983) (holding that general financial

pressures and need to support one's self and family do not constitute duress).

Here, the most serious threat Defendants allegedly made was that Plaintiffs would lose

their jobs if they did not sign the Arbitration Agreements.  However, similar to Harsco, none of the Plaintiffs allege any facts or present any evidence that Defendants were responsible for the financial pressure Plaintiffs allegedly felt when forced to decide between termination of employment and signing the Arbitration Agreement.  To the contrary, like the situation the employee faced in Harsco, Plaintiff Spevak stated that he signed the Arbitration Agreement for fear of losing his job and being unable to support his family. (See Spevak Dep. 66:21-67:1, Aug. 7, 2008.)  Morever, Plaintiffs cannot claim that Defendants manipulated their finances simply because they purchased new clothes in reliance on their employment with Defendant New Day. (See Gorcey Dep. 32:5-9.)  While sympathy to Plaintiffs' position may arise under the facts, the law is clear that pressures to support one's family, to dress properly for a job or general financial pressures are not caused by Defendants and do not amount to duress under the law.  Moreover, Plaintiffs fail to cite any cases from Pennsylvania or the Third Circuit where a court has held that the threat of termination constitutes duress.  The Court will not find duress under the facts presented by Plaintiffs.  Accordingly, Plaintiffs' argument that the Arbitration Agreements were executed under duress, and for this reason are void, is unpersuasive.

       2.     Unconscionability

Plaintiffs also raise the defense of unconscionability.  "Under Pennsylvania law, the test for unconscionability is whether one of the parties lacked a meaningful choice about whether to accept the provision in question and the challenged provision or contract unreasonably favors the other party to the contract."  Grant v. The Philadelphia Eagles, LLC, No. 09-1222, 2009 U.S. Dist. LEXIS 53075, at *18 (E.D. Pa. June 24, 2009).  Unconscionability has both procedural and

substantiative elements.  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999).

Under Pennsylvania law, there must be both procedural and substantive unconscionability in

order to void an arbitration provision.  See id. at 181.  Plaintiffs have the burden of proof to

present facts which give rise to unconscionability.  Williams v. Borough of West Chester, 891

F.2d 458, 460 (3d Cir. 1989).   Plaintiffs have presented evidence that viewed in a light most

favorable to them gives rise to an inference that the Arbitration Agreements may be both

procedurally and substantively unconscionable, and consequently a jury must determine the

validity of the Arbitration Agreements.

a.      *Procedural Unconscionability*

Procedural unconscionability concerns the process by which the parties entered into the

contract.  The Pennsylvania Supreme Court has defined procedural unconscionability as the

"absence of meaningful choice on the part of one of the parties."   Witmer v. Exxon Corp., 434

A.2d 1222, 1228 (Pa 1981).  Procedural unconscionability is generally found where there is a

contract of adhesion– a contract prepared by a party with excessive bargaining power and

presented to the other party on a "take it or leave it" basis.  Denlinger, Inc. V. Dendler, 608 A.2d

1061, 1068 (Pa. Super Ct. 1992).  The general test is whether the party challenging the agreement

had any meaningful choice regarding the acceptance of its provisions.  Thibodeau v. Comcast

Corp., 912 A.2d 874, 886 (Pa. Super Ct. 2006).

In support of their procedural unconscionability argument, Plaintiffs rely on Lucey v.

FedEx Ground Package Systems, Inc. , No. 07-4372, 2009 U.S. App. LEXIS 839 (3d Cir. Jan. 8,

2009), a non-precedential Third Circuit opinion.  In Lucey the district court, applying

Pennsylvania law, denied, in part, defendants' motion to compel arbitration of a dispute filed by

18

former FedEx truck drivers.  Id. at *4.  The plaintiffs claimed that they were presented with their employment agreement, which contained an arbitration clause, shortly before their jobs were to start with FedEx.  Id. at ** 1-2.  The court held that such circumstances gave rise to a claim of procedural unconscionability.  Id. at *4  The facts confirmed that plaintiffs did not have an opportunity to read and review the agreement, consult counsel or negotiate any changes before signing the document.  Id.  The court accepted plaintiffs' argument that they were already financially committed to driving for FedEx, even though they were not yet employed, and thus "walking away" was not a fair option.  Id.

In affirming the lower court's decision as to procedural unconscionability, the Third Circuit in Lucey rejected FedEx's argument, which is also made by Defendants here, that plaintiffs did not take reasonable steps to obtain a copy of the agreement or avail themselves of the opportunity to inquire and learn about the provisions of the agreement prior to making the financial commitment.  Id. at *4-5.  In disagreeing with FedEx's argument, the Third Circuit rejected FedEx's reliance on Zimmer v. Cooperneff Advisors, Inc., 523 F.3d 224 (3d Cir. 2008), the same case on which Defendants here rely.  The Third Circuit reasoned:

> This Court's decision in Zimmer was premised on its factual background. Zimmer concerned an employment contract between Steven Zimmer, a Harvard-educated economist, and a trading investment firm. Zimmer argued that he did not make a meaningful choice to enter into the agreement because the agreement was presented to him only after he began working for the firm. This Court rejected this argument, noting that Zimmer had significant bargaining power, not only because he was highly educated, but also because he had numerous job opportunities. Our decision was also premised on the fact that Zimmer was aware that his employment was contingent on the negotiation of an employment agreement and that either party could terminate those negotiations. We specifically distinguished this case from one in which a party with limited educational background,

19

> narrow options for employment, and little bargaining power is
> presented with an agreement on a take-it or leave-it basis.

Lucey, No. 07-4372, 2009 U.S. App. LEXIS 839 at * 5.

Here, similar to the facts in Lucey, all Plaintiffs have testified that they were presented with the Agreements on either their first day of employment or several months after commencing work.  Unlike the facts in Zimmer, no Plaintiff here was aware of the requirement to sign the Arbitration Agreement before it was presented to them.  Each Plaintiff testified that it was their understanding that if they refused to sign the Arbitration Agreement, they would be terminated.  Plaintiffs felt as though they could not ask questions, they were not given a copy of the document at the time of signing and none of them were able to consult with counsel.  These facts all give rise to an inference that Plaintiffs were presented with an adhesion contract on a take it or leave it basis.

Reading Zimmer and Lucey together, it becomes evident that determining whether a party has sufficient bargaining power is fact dependent.  The Court recognizes that Plaintiffs here may fall somewhere between the plaintiff in Zimmer and the FedEx drivers in Lucey in determining the amount of bargaining power they possessed.  Plaintiffs here were mostly college educated.  However, they testified that they did not have alternative employment options and had already committed to working, or were working, for Defendant New Day.  Because Plaintiffs have presented facts in support of their argument that they lacked sufficient bargaining power when presented with the Arbitration Agreements, a jury must determine their enforceability.

b.    *Substantive Unconscionability*

Plaintiffs advance four arguments in support of their position that the terms of the

Arbitration Agreement are substantively unconscionable.  Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.  <u>Huegel v. Mifflin Const. Co.,</u> 796 A.2d 350, 357 (Pa. Super Ct. 2002).

Plaintiffs' first two arguments on substantive unconscionability of the terms of the Arbitration Agreement attack the provision conditioning joinder and class actions in arbitration on Defendants' consent.  Under the terms of the Arbitration Agreement, the employee, without written consent from New Day, does not have the right to "(1) participate in a class action in court or in arbitration, either as a class representative or a class member, including claims arising under the Federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.; or (2) join or consolidate claims with any other claims asserted by any other person."

As recognized by Judge Pollack in his June 30, 2008 Memorandum Opinion, "A series of Pennsylvania cases have held that limiting the use of the class-action vehicle, if it raises costs to the point of effectively preventing individual redress, is substantively unconscionable."  <u>See</u> Opinion Memorandum, June 30, 2008, Pollack, J. (Docket No. 27); <u>Homa v. American Express Company</u>, (finding that class-action waiver in contract between cardholder and credit card company was unconscionable); <u>Thibodeau v. Comcast Corp.</u>, 912 A.2d 874, 886 (Pa Super Ct. 2006) (holding class action waiver agreed to by cable customers was unconscionable); <u>McNulty v. H & R Block</u>, 843 A.2d 1267, 1268 (Pa. Super. Ct. 2004) (finding a class-action waiver unconscionable where it precluded plaintiffs from joining in action to recover electronic filing fee).  The determinative fact in finding a class action waiver unconscionable is whether the prospects of a favorable verdict create an incentive for a plaintiff to file the action individually.

21

See McNulty, 843 A.2d at 1273.  Here, while the individual actions are worth more than the

small fees at issue in Thibodeau, Homa, and H&R Block, it is for a jury to decide whether

Plaintiffs would lack incentive to bring their claims individually.

In addition, the waiver here is unique because it also precludes an employee from opting

into an FLSA action or from consolidating his or her FLSA claims with those of other similarly

situated employees.  The FLSA permits Plaintiffs to join in or consolidate their claims in court.

See 29 U.S.C. § 216(b).[7]  Specifically, § 216(b) has an opt-in clause which requires employees

to provide their consent before being included in a joint action with similarly situated employees.

This protection is designed to prevent employees from being unknowingly swept into a

representative class and having their claims litigated without their knowledge.

Here, two employees, Spevak and Cox, exercised their rights under 216(b) and opted into

the claims filed by the seven other employees in their Complaint.  Defendant New Day, in effect,

is trying to add an additional requirement to the statutory provisions prescribed in 216(b), one

that would require employees such as Spevak and Cox to obtain New Day's consent before

opting in to an action.  A court in this district has previously held that the rights afforded under

216(b) are substantive and not merely procedural.  See Ellis v. Edward D. Jones and Co., L.P.,

527 F. Supp. 2d 439 (W.D. Pa. 2007).  While waivers of substantive statutory rights may be

recognized, the Court draws inferences from the record that Plaintiffs were unaware that they

---

[7]  Section 216(b) provides a remedy for damages or injunctive relief to an employee
against an employer who violates the FLSA.  In particular § 216(b) provides, "An action to
recover. . . may be maintained against any employer (including a public agency) in any Federal or
State court of competent jurisdiction by any one or more employees for and in behalf of himself
or themselves and other employees similarly situated."

were surrendering these rights when they chose to sign the Arbitration Agreement.  Because this waiver term unreasonably favors Defendant New Day and there is a factual question as to whether Plaintiffs understood the waiver and were able to knowingly assent, the Court finds this provision may be substantively unconscionable.[8]

Plaintiffs also argue that the Arbitration Agreement is substantively unconscionable because it grants only Defendants access to a court.  While the Arbitration Agreement on its face provides equal access to the court system, the permissible actions to file in court are limited to "bankruptcy, replevin, judicial foreclosure, injunction, or other prejudgment or provisional remedy relating to or to protect any collateral, trade secrets, contract rights, unfair competition, security or property interests . . . ."  These actions are those which an employer, not an employee, would normally file.  Defendant Posner's testimony supports this inference. He testified that his understanding of this provision was to provide the employer with access to a court to obtain injunctive relief, stating "Arbitration does not get in the way of that."  (Posner Dep. 62:22-63:18, Sept. 8, 2008.)

Under Pennsylvania law, "the reservation by a company to itself of access to a court, to the exclusion of the consumer, creates a presumption of unconscionability, which in absence of business realities that compel the inclusion of such a provision in an arbitration provision render[ed] the arbitration provision unconscionable and unenforceable."  Lytle v. Citi Financial Servs, 810 A.2d 643, 665 (Pa. Super. Ct. 2002).  The Pennsylvania Supreme Court in Salley v.

---

[8] Plaintiffs have presented evidence to support their position that they were unaware of what they were signing. At trial on this issue, both parties will be afforded the opportunity to establish whether Plaintiffs were aware of the rights they were surrendering, including their ability to join in actions filed by similarly situated employees, when they signed the Arbitration Agreements.

Option One Mortgage Corp., 925 A.2d 115 (Pa. 2007) cast doubt as to the validity of the presumption in Lytle, but did not overrule it in all respects.  In Salley, the Court held that the burden to prove unconscionability is on the party asserting its application and thus the reservation of court access for foreclosure actions by one party does not create a presumption of unconscionability.  Id. at 129.  Rather, the foreclosure exception is permissible because there are apparent business justifications for excepting foreclosure proceedings from the arbitration requirement.  Id. at 128.

Here, there many other types of actions, in addition to foreclosure proceedings, Defendant New Day attempts to exclude from arbitration.   Defendant New Day fails to present any evidence or even make the argument that there exists a valid business justification for excepting the other types of actions from mandatory arbitration.  Without any evidence justifying the exclusion of these actions from arbitration, the clause at issue has the effect of arbitrarily permitting Defendant New Day to access the court system without providing Plaintiffs with the same benefit.  Such a clause gives rise to an inference of substantive unconscionability which must be resolved by a jury.

Finally, Plaintiffs argue that the Agreement is substantively unconscionable because it requires the "loser" to bear the costs of arbitration, a rule that typically does not apply in United States court system.   The Court finds this argument unavailing.  The Arbitration Agreement makes clear that Defendant New Day will advance any costs at the inception of the arbitration. (Docket No. 63, Exs. 1-9)  If Plaintiffs are successful in their claims, they will not be responsible for the costs.  Id.  Further, even if Plaintiffs do not prevail, they will not be liable for costs if they can demonstrate to the "satisfaction of the arbitrator that they are of limited financial capacity

and cannot reimburse" Defendant New Day for the costs of arbitration.  Id.   Therefore, Plaintiffs

will only be required to cover litigation expenses if they are unsuccessful in their claims and can

afford such costs.  Arguing that Plaintiffs will be responsible for such costs is purely speculative.

Speculation is not enough to invalidate an otherwise enforceable arbitration agreement.  Green

Tree Financial Corp. v. Randolph, 531 U.S. 79, 92 (2000) (holding that party attempting to resist

arbitration by arguing it is prohibitively expensive "must demonstrate a likelihood of incurring

such costs."); Goodman v. ESPE America, Inc., No. 862, 2001 U.S. Dist. LEXIS 433, at *4 (E.D.

Pa. January 19, 2001) (holding loser pays provision did not invalidate arbitration agreement).

Accordingly the loser pays provision is not unconscionable.

### 3.    Unsigned Arbitration Agreements

Finally, Plaintiffs argue that the Arbitration Agreements are not binding because some

were unsigned by Defendant New Day, the party attempting to enforce them.  The existence of a

signature by one of Defendants' representatives is immaterial.  While the FAA requires a writing,

it does not require that the writing be signed by the parties.  Genesco v. T Kakiuchi & Co., 815

F.2d 840, 846 (2nd Cir. 1987).

Nevertheless, because Plaintiffs have presented evidence which creates the inference that

the Arbitration Agreements are both procedurally and substantively unconscionable, Defendants'

Motion to Compel Arbitration is denied and a jury trial will be ordered as to the enforceability of

the Agreements.  An appropriate Order follows.